on behalf of the appellant, Ms. Jennifer J. Gibson, on behalf of the appellant, Mr. Michael T. Coffin. Good morning, counsel. Ms. Gibson. Thank you. May it please the court, again, my name is Jennifer Gibson, and I'm joined today by the trial counsel in this matter, Attorney Elizabeth Wakeman. She's at counsel's table. We represent Georgia at Burstein, and I know that there are many issues that we raised in our briefs, but the one that I'd like to focus on and I believe is the biggest issue, and I hope you do too, is the valuation of U.U.C. and D.C.C. It's our position that the trial court improperly based the value of these business holdings on the operating agreement, because the operating agreements in this case weren't competent evidence of valuation. Well, counsel, did the expert testify that any other method of valuing J's D.C.C. and U.U.C. shares would have been better than relying on the buyback provisions of the agreement? Better. I don't know that he used the word better, appropriate, proper. I mean, use any adverb you want, but was there any testimony about anything else in the record? What I think there was testimony is that he wasn't able to value the businesses based on fair market value. And I think if you look back to the case law, the case law itself expresses a preference for fair market value, and the case law defines what fair market value is. And that case law is consistent with Black's Law Dictionary, and what that means is fair market value is what a willing buyer would pay to a willing seller under circumstances when neither is under compulsion to buy or sell. Well, what other evidence did the court have in front of it? Well, it didn't, and that's the problem. And I think if you look back in the record, there was a lot of attempts to present fair market value. And in fact, there were, I want to go through, four subpoena attempts. Well, except that the companies complied fully with the subpoenas, did they not? Yes. Okay. And so I think this is another one of the trial court's errors. But here the bottom line is there were a bunch of these subpoenas, and they were quashed and then redone and redone. So the ones that were ultimately passed on by the court were complied with. But is your issue that the subpoenas as originally drafted should have been complied with? Is it somewhere in here I recall that both experts said, well, we didn't have everything that we would need in order to present the value based on alternate theories. Is that a fair assessment? Correct. Both experts agreed, both Mr. Modica and Mr. Fontana, whose testimony was later stricken, agreed that they couldn't do a traditional fair market value because they just didn't have the information. Was that information originally sought? It was. And, you know, if I can go back to these subpoenas, and I honestly think the first subpoena was probably the most reasonable subpoena. If you look back at it, it asks for operating statements, tax returns, business ledgers, you know, things that normally you wouldn't think would be hard to produce. And the trial court quashed it and basically said this is burdensome. At this point, I think all you should seek is what's available to Mr. Gerstein, to Jay, under the operating agreement. So we went ahead and gave it a try, issued a second subpoena. And we asked for documents, like the trial court said, that were just available to Jay under the operating agreement. And then additionally, some information regarding sales of other members' interests. So we had some prior sales. Again, this was moved, Jay moved to quash this. But it was denied, so we did get this filled. But again, this was only the information that would have been available to members under the operating agreement. We tried a third subpoena, and that one got quashed because it was past the discovery cutoff date. But the trial court said, go ahead and issue it again. I'll allow you to issue it again. So we issued it again, and then the court said, well, let's see an affidavit from your expert. And we did. We produced an affidavit from our expert specifically explaining why he would need this information to value these business holdings. And in the end, the trial court only allowed, now with DCC, it allowed the subpoena, but cut it off at September 2010. And I think by cutting it off at September 2010, you cut off the information that the expert's going to need to perform. What did he testify? What did the expert testify he was going to perform with that information? What he did testify is that he was unable to perform a traditional fair market value using either the income approach or the asset approach, methods that are traditionally used to perform. But yet you went to trial, even in that situation. Isn't that correct? Well, and that is correct. Even though you weren't satisfied with the subpoenas? And that is correct. But you have to understand that this is a forced subpoena. And after four tries, and then we even, you know, we had a motion, you know, and granted this was after the trial court had heard evidence, but before it made its ruling, reopen the proofs. You know, this is not right. Let's reopen the proofs. Let's get a competent valuation. Now, with UCC, I think the error was even worse in that the trial court not only cut off the subpoena at September 2010, it only allowed seven out of the some 30 items that the expert was seeking. But now, counsel, in the motion to reopen the proofs, was there any specific information that was stated was needed? There wasn't, was there? Well, specific, no. But I believe what – Well, isn't that a prerequisite for a court to – isn't that information important for a court to have in order to rule on any motion to reopen the proofs that there was the existence of some specific evidence that would have been introduced at trial? Well, right. Typically. But you don't know until you get the subpoena what the specific evidence is you're looking for. And what that specific evidence – even if it exists. So it's kind of hard in this case. It's a little different to say specifically this is out there because at this point, until you get your discovery, you don't know. In your brief, you relied heavily on the Gunn case, this Fifth District case. But isn't that case distinguishable from the facts of the case before this court in that in Gunn, the trial court rejected valuation based on the buy-sell agreement, but yet there was evidence in that case both of a sale of two additional shares between partners as well as an expert who testified to using two other valuation approaches? Right. And that's how I think it's distinguishable. But the point is, is that from the very beginning, you know, we tried and it was our goal to present fair market value. That's what we wanted to do all along. Where opposing counsel, you know, kept trying to restrict our discovery and restrict us, no, the operating agreement. So we were definitely trying to produce more than just the operating agreements. And that's where I think the Clayton case comes in really, really important here is that in Clayton, yes, valuation based on the operating agreement was allowed. But in Clayton, it was the only evidence produced. And both parties seemed to rely on the operating agreements. Where, and then in Clayton there's another really big distinguishing factor in that the operating agreement, the valuation based on the operating agreement was computed annually. And there was testimony that it was based on the hard assets of the corporation. Where here, the amount, there's no testimony that it's based on the hard assets of the corporation or that it's anything but a random buyout provision. And I think that's what the Gunn case warned us about, that these operating agreements aren't necessarily a good indicator of fair market value. Well, with respect to DCC, couldn't the, your expert have found comparable medical practices or sales of medical practices to value J shares in DCC? I mean, wasn't this information available? That wouldn't necessarily have relied on the subpoenas. If the comparable sales method was used, but there was other, there's other methods to perform fair market valuation. And I'm not even certain because there wasn't any testimony, so I can't speculate whether he had enough information. But what he did say is that he didn't have enough information to perform a traditional valuation. And the Gunn case, and I'm sorry, encourages, I think the Gunn and the Grunston case encourages several methods. You know, it encourages that the valuation be done, you know, by the asset method, the income method. You know, and other various methods so that the trial court can apply the method that it thinks most appropriately fits the situation here. Why don't we turn for a minute to the question of classification of the UUC shares? Yes. If Jay were a trustee of a trust that held the UUC shares with his brother Scott as the beneficiary, would the UUC shares be Jay's marital property? Well, you know, I'm not certain, but I'm not even certain that that would be allowed. Because remember, Jay at one time held some shares, 10 shares, in an IRA, you know, in something other than his own personal name. And he had to transfer them out. It was when he owned it as ALG, he had to transfer that out. Because the operating agreement only permitted him to own the shares. Well, if Jay owned 50 percent of a plot of land and his brother owned the other 50 percent, would his brother's 50 percent be treated as marital property in divorce proceedings? Probably not, if his brother really owned it. If his brother really owned it. But the point here is, is that his brother can't own it. So then didn't Jay own it in trust? Wasn't there an oral, in essence, an oral expressed trust here? Well, his testimony was that he was the gatekeeper. And again, I think that the operating agreement, the language is very clear that it's just not something that's permitted. I think that if we believe Jay's testimony, that definitely Jay's brother or Jay's parents gifted the shares to him at the point where they couldn't own it anymore. And how do you get the fact that they gifted it to him? What evidence is there of a gift as opposed to a trust where he would have been, Jay would have been the nominee? Well, there's no paperwork of a trust. There was no really evidence of a trust. But there was testimony that he transferred the shares. There was that handwritten note that stated in 2000, I transfer these shares. It was a very vague note. So we know that they were transferred to him in some way. But I don't know that there's anything that establishes a trust. And granted, the tax returns show that certainly Jay is sharing the dividends with his family and with his brother, which certainly he's entitled to do. So if it was a gift to him, why would he be sharing it? I mean, if they gifted these shares of stock to him, why would he be sharing those? I really can't speculate as to why he would be sharing them. But the point is, he acquired them. And even if you accept Jay's shares out, okay, or Scott, his brother's shares out, you still have the shares that he acquired from his parents. And you have the shares that he acquired from his parents. You're talking about after they died? Correct. If you're not convinced that Jay is really the owner of these shares and that they were gifted to him, you still have the shares that he acquired when his parents died. And I think certainly this is a classic case of the second type of commingling. And, you know, I'm glad Judge Burkett's on this panel because there is a case that he authored, a Rule 23, the Seeger case. And I'd like an opportunity to explain why I think the Seeger case is different from this case. Because I think that the Seeger case – Well, but it's a Rule 23. It is. We can take a look at it, but as you know, it's not precedential. And I understand that. But I think that there are some certain things that in this case really cut against the facts in that case. And number one in this case, all of the shares here were acquired during the marriage, okay? So because they were acquired during the marriage, you have the 503B presumption that applies that they're marital. They're immediately cloaked with the 503B presumption. And may I finish the thought? Sure. Thank you. Number two, the shares, I believe in the Seeger case, never lost their identity. They started as MedCorp. They ended as MedCorp. But here, they lost their identity. You have Jay's shares. Excuse me just a second. I would respectfully ask that during the course of oral argument, there be no conversation in the gallery, please, so that we can concentrate on the arguments of counsel. Go ahead. Thank you. You have Jay's shares, 31 in his name, 10 in his IRA. They get combined with his parents' shares, and we don't know whether they're combined at the point where it's ALG or AUC because the testimony is kind of unclear. We know it was somewhere around 2000 or 2001. And then you have Scott's shares. He did testify that he transferred his shares in 2000 when they were AUC. So you have Jay's ALG shares combined with his parents' ALG or AUC, we don't really know, combined with Scott's AUC, all put together and used to acquire this new asset, UUC, where he had to sign a new shareholder agreement. This is a new asset, a new shareholder agreement, new rules. Only urologists can own this. These 83 shares are used to purchase 14.62 shares. And then second of all, I think in the Seeger case there was a little bit of a waiver for failure to develop argument, and I would hope that there is no waiver in this case and that we've developed our argument. Thank you, counsel. You'll have time on rebuttal. I appreciate it. I wanted to explain that Justice Burkett is not able to be here today, but he will participate in the deliberation and decision on this case. Thank you. Good morning, Mr. Kaufman. Good morning, Your Honors. Ms. Wakeman, Ms. Gibson, may it please the Court, I represent Jay Burstein. In this case, the trial court awarded Georgia 54% of the assets plus permanent maintenance. She appeals on six issues. And the relief that we're requesting is not only to affirm the trial court's ruling, but we're also respectfully asking for a clear rule of law that would assist future litigants, showing that minority shareholders have the restricted buyout agreement formula and an operating agreement be applied for minority shareholders as a rule of law. I think this comes down to whether or not Jay is a minority shareholder or whether or not he's a majority shareholder. And that's the relief that we're asking, hopefully. With regard to the issues, there are six. Why don't you start with the issue that counsel started with with regard to the valuation, please. Valuation. The buyout agreement is highly reliable for quite a number of reasons. When somebody puts a value on it, like a house appraiser, they're literally printing money. Banks rely on this for loans, mortgages, things like that. And in terms of the reliability of a buyout agreement, standing behind Georgette is the Illinois Department of Revenue. They have both civil and criminal investigators. If somebody cheats on their taxes or their valuation, et cetera, the Illinois Department of Revenue and the Internal Revenue Service are going to help Georgette determine whether or not somebody, let's say in Jay's position, is misstating the value of their property. In addition to the IRS and the Illinois Department of Revenue, we also have bankers. When the bankers go to make a loan, they say, well, what are your assets? Give us a copy of your operating agreement. And they take a look at it and they value the property, as we are doing here. And not only is it the banks, it's the bank examiners. And not only is it the bank examiners, but Jay in UUC has 300 partners. So 300 partners are taking a look at each other and taking a look at the management. Jay's stock share is a Class B. He can't do anything. He can't manage. He can't look at a book of records. He's just an investor. And the Class A people that started the company in UUC are heavily regulated. Again, it's like printing money. Well, didn't the trial court hear an expert say that using that operating agreement was not the best method of valuing the shares? And nevertheless, the court went ahead and used actually one of the figures Jay had given him. Isn't that right? Mr. Modica's testimony, trial court expert, the trial court chose not to believe his testimony for a couple of different reasons, one of which he specifically did not offer a fair market value. And he did take it in the context of a lot of documentations. Ten years of quarterly payouts, interest payouts of UUC were provided to the trial court. Well, how do you respond to counsel's argument that they didn't have the material they really wanted in those subpoenas and needed to do that? The Malters case, Your Honor, it doesn't matter what they want or don't want. It doesn't matter what's optimal. It doesn't matter what the bankers want. The state of Illinois says, Malters, that, quote, competent evidence is the standard. And there were droves of competent evidence here. Furthermore, the operating ---- Well, counsel, I mean, if you have a whole picture and you can have a very, very competent view of one-tenth of the picture, that doesn't make the entire thing competent nor reliable. Well, respectfully, Your Honor, and I am directly answering your question. Okay. Georgette was not married to 300 partners in UUC. She was not married to the 20 other orthopods and everybody else at the clinic. She was not married to the LLC or the MWC. She was married to Jay. And Jay's income came in ---- Jay's income were on his K-1 statements, which we turned over in 2008. And when you match the K-1 statements, because the last two years' K-1 statements is part of the formula in the operating agreement, which, frankly, he agreed to. Okay, I promise that if I'm part of this operating agreement, I will subject myself to this specific value. And it's a precise calculation, which is, frankly, more reliable. But isn't that his agreement to his partners? Yes, Your Honor. Not his agreement to the world. But contractually, there are those other protections in the world, like bank examiners and the IRS. The IRS is ---- I get that. But the IRS is really not a party to this divorce proceeding. No, however, what happened, Your Honor, is if they really wanted Jay's information, they would have just stayed with Jay. But what they did is they went on over and they started to subpoena information that came from the Arthropod, Jay's urology surgeon. And the Arthropod has nothing to do with ---- they actually received ---- But the ultimate issue is what is the value of what Jay owns? And if these 300 physicians owned 1,000, I don't know, Monets, and they say, well, you know, if somebody wants to sell their 1, 100th or whatever of this, and we're going to say it's valued at $10, that's probably not the real value of 1, 100th of that art collection. So why is this different? For two reasons. One is Jay contractually agreed that these shares would be governed by this operating agreement and nothing else. I agree with you in terms of him selling it to his partners or a buyout upon his retirement. But why is the value of that determined by this group when all of our divorce law says it's the value of the assets that are acquired during the marriage? And I'm respectfully submitting that this formula is the fair market value. This formula is the best and most reliable value because it is relied upon by banks, bank examiners, et cetera, for those 300 partners. So we should treat these types of valuations differently than we treat the valuation of all other assets, which is fair market value. Malter says competent evidence, not fair market value. Each time they went into court, they said fair market value, and I don't find that in the law. It's not fair market value. And the market, by the way, they need a buyer in order to make a market, and the market, if you take a look at comparable sales, there were comparable sales. The clinic, 11 doctors actually sold. We know the exact number. We have a history of comparable sales for the sales of houses. There were submitted in discovery 22 specific sales from the UUC doctors that left and sold. So we have two types of evidence. We have a formula that is not dependent on outside sales. The formula is only dependent upon distributions. And if I own an apartment building and I had a 50 percent partner and I got the monthly rents but I still kept the building, those monthly rents were the distributions. We know what those numbers are, and that's what the formula bases that value on. Outside of that, if I were to sell the apartment building and I took a look at all the other apartment buildings in the community, four flats, et cetera, and I derived, we have that information. 11 doctors and 22 doctors, depending on the two businesses. And so both of them match up. And, stated another way, there's no contradictory evidence in the record. It's a manifest wage standard on valuation is my understanding. But counsel's argument is I couldn't present any countervailing point of view because the subpoenas were so clipped. Those subpoenas. I don't want to put words in her mouth, but that's the gist of it. Those subpoenas were not relevant, irrelevant, unnecessary. Jay and Georgette spent four years out of a finite lifespan stuck in court spending a lot of money with them, frankly, on a witch hunt. If Jay was like, I know your honors wrote some rule 23 decisions, and the one individual was said to be a 60% shareholder, and the bookkeeper was his wife, and she talked about how he cheated on the taxes. But this is not that situation. If Jay were a 60% shareholder of all these 300 doctors, fine, go after him. If Jay were a 60% shareholder of all the 20 doctors in the clinic, fine, go after him. And my relief was respectfully tailored just to minority shareholders subject to an operating agreement to have at least a presumption. Unless there is a specific evidence of clear and convincing evidence of fraud, such as would follow the Fraud and Transfer Act law, then don't make Jay and Georgette stay in court for four years spending, frankly, $625,000. This estate is only $1.3 million. They're spending $725,000 on attorney's fees for four years of something that will never produce a result that we already knew at the time of trial, which is the formula, the K1s, and the prior sales. We're not speculating it's the future sales. We knew what sales existed by the time we went into that trial in 2011. And that's why it's a narrow rule, but it will save us so that we can tell doctors and nurses, which Georgette's a nurse and Jay's a doctor, that the court system is not going to hold futures and doctors and nurses hostage for four years and cause all this money to be spent when we already know the value. And it's, frankly, a highly reliable value. It's a better value. And it's relied upon by not just the people within the company, but all the people that they deal with and taxing bodies, et cetera. It's highly regulated. It's highly supervised. And also, counsel addressed the classification issue. Right. Did you want me to move to that one? Yes, please. With regard to classification, it was clear trace evidence to third parties. On page 11 of the final judgment order, the judge stated, quote, 42, 80 thirds of the 14.62 shares of UUC are assets not belonging to the marital estate or to the non-marital estate of either. So what the court found is it never made its way into the marriage. They were third parties' assets. They were traced to a third party. Well, Jay held them, did he not? Yes, Your Honor. But them goes into two categories. Them is a legal title, which entitled Jay to open the mail and write the books and write the checks. He didn't get a dime. And them also means equitable title, which Scott gets the money, Alvin gets the money, Gertrude gets the money. Split between legal title and equitable title. And is that because the operating agreement prohibited others from holding title? No. Respectfully, Your Honor, joint exhibit 2851 expressly gives Scott, Alvin, and Gertrude the right to hold these shares, and it's called mere assinees, which is what they were. And it says, quote, shall be entitled to receive the allocations and distributions but not participate in the management of the company. So that, excuse me, that is the operating agreement that was in existence at the beginning. I know at one point it was changed to allow others to, I believe, hold shares. But you're talking about this agreement before any change. If I'm understanding Your Honor's question correctly, throughout the period of time challenged by the classification or challenged by the appellant's brief stating that they were not entitled to, respectfully, they omitted the part that says, quote, except as otherwise provided herein. So if you read through Section 5.03, which are joint exhibits 2851 and 2849, it expressly gives them the right to be beneficial interest holders, which is what happened. So classification-wise, even though I did argue that it was non-marital, I just didn't want to waive the issue, but it was not non-marital. However, if Your Honor finds it to be marital, the net result's the same, no remand. And as for the Clayton and Cutler cases, they say that we must consider the contractual restrictions. Going back to valuations briefly, I know Your Honor's touched on the Clayton and Cutler cases, and I think Your Honor's cases are Riggio and Hanuson. But the bank's going to do that anyway. They're going to say, well, what restrictions do you have? Such as a title commitment on the sale of a piece of property. Before you extend a loan or get a home equity loan or something like that on a piece of property, you want to see whether or not there are any encumbrances on this property. And that's what they're doing here. They take a look and see what encumbrances exist in the operating agreement, and those encumbrances are worth money. Which is why the experts say, well, we'll deduct for non-marketability and we'll deduct for this, et cetera. And then they come up with their formula. It's real money. Counsel, I'm going to ask you to go back to that agreement again in the language that you quoted. You're saying that Jay could, that, I'm sorry, that Jay's parents and brother could be beneficial owners by the very terms of the agreement. Is that correct? Exactly, Your Honor. 2851 is the joint exhibit number, the section, and it's in two or three of the operating agreements. Because you see we tendered a couple of different operating agreements. 5.03E, 5.03E. What they do is they only read from 5.03A. They didn't read down the page. And 5.03A starts out with saying, quote, except as otherwise provided herein. And E provides the exception. Exactly. And it's called, their title is called mere assignee or transferee. And then it says, shall be entitled to receive the allocations and distributions. And it goes on to say, but you can't take part in the management. Thank you. Thank you very much, Counsel. Ms. Gibson. And how do you understand those, that language in the agreements, Counsel? Well, I understand the agreement. There are two sections that I did focus on. One section that provided each member hereby represents and warrants to the company and to each other member that the member is acquiring its interest for its own benefit. For investment, not for resale, distribution, or fractionalization thereof. And then another portion that states that, and I quoted this, unless in accordance with the operating agreement, no member may sell, sign, pledge, hypothecate, give, acquiesce, and so on, his or her interest. And if they do, it's void ab initio. And the interesting thing is, members, they have to be urologists. So who can be an assignee? Is it a urologist? And I'm not familiar with the portion he's quoting, but if read in context, I would submit that possibly you can assign your interest to another urologist or another member of the group who is eligible to own the shares. But certainly I wouldn't think that you can assign your interest in a medical corporation to somebody else and certainly possibly not a non-doctor. Now, I know Mr. Burstein's brother happens to be a doctor, but his parents. Could he, you know, could he hold that in interest for a non-doctor? In light of the public policy and the law that says non-physicians can own shares in medical corporations, I guess the whole agreement has to be read in context. I'd like to switch back to the valuation of the UUC and the DCC, and I believe you'll find in the record an oral objection and in answer to your question previous, Justice Enoff, an oral objection prior proceeding to trial stating that, listen, we don't have all of our evidence here. And I think, you know, counsel stated that fair market value is not the standard that the law requires, but I think if you look at the Gunn and the Grunston case, they do express a preference for fair market value. And the Grunston case was a closely held corporation, just like UUC. And the Gunn case was a professional corporation. It was a law firm, which is kind of akin to a medical practice. And I think there's a lot of things in here that point to that this just was not a fair market value. If you look at the trial court placed the value on the UUC of $260,000, but if you look at the dividends it's producing, yearly dividends on average of $115,000, who in here, if they had the money and weren't able to own these shares, would jump right on it? Because if I had the money and I was a doctor, I would. Because in two years, I mean a little over two years, you have your investment back. I don't need to be an accountant to know that this is not fair market value. Another interesting thing is the trial court, it struck Mr. Fontana's testimony for being based on an arbitrary date, September 2010. But the dates that it relied on were not too much better than that. The date that the trial court relied on for DCC was September 2010. And for UUC, I believe it was actually for UUC, I think it was December 2009. And then for DCC, it was September 2011. I think, wasn't it June? June, June 2011, correct. So the other dates weren't all that any more accurate. Second of all, the trial court's comments, you know, I think it knew it didn't have a competent value because it stated on the record, well, if I don't have a competent value, I'm just going to find some way to make this right to take care of Ms. Burstein. And that's when it came up with the idea of sharing these dividends. Well, I mean, wasn't that suggested by counsel for Georgia? It was. I mean, that was actually in the written closing argument, was it not? Yes, but if you look at the context before it, what was stated, and if it's the comment that I'm thinking of, you look just a couple of lines before it, that first and foremost, we need a competent value. And then it went on to, well, as a last resort, and you have to remember that at this point, three subpoenas were quashed, one was limited, her motion to reopen the proofs was denied, and at some point, you have to accept what the trial court is doing and go to your avenues of either a motion to reconsider or to appeal. Thank you. Thank you very much, counsel. At this time, the court will take the matter under advisement and render a decision in due course. We stand in brief recess until the next case. Thank you very much.